IBP, INC., APPELLANT AND CROSS-APPELLEE, V.
LISA SANDS, APPELLEE AND CROSS-APPELLANT.
563 N.W.2d 353

Filed May 30, 1997.   No. S-95-968.

Thomas F. Hoarty, Jr., and Christopher R. Hedican, of McGowan & Hoarty, for appellant.

Thomas F. Dowd, of Dowd, Dowd & Fahey, for appellee.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

McCORMACK, J.

This is an appeal from the order of the district court which affirmed the decision of the Nebraska Equal Opportunity Commission (NEOC). NEOC found that Lisa Sands was discharged from her job as a chemist with IBP, inc., for narcolepsy and that her discharge was discriminatory. We affirm.

## BACKGROUND

Sands began experiencing symptoms of narcolepsy when she was 14 years old. Symptoms of narcolepsy include hypersomnia, sleep paralysis, hypnagogic hallucinations, and cataplexy. Sands' symptoms included tunnel vision and blackouts. On January 4, 1985, Sands was examined by Dr. Joel Cotton, who diagnosed Sands with narcolepsy and treated her by prescribing Ritalin, a medication used by narcoleptics. The Ritalin diminished her symptoms considerably.

In August 1985, during an office visit with Dr. Cotton, Sands explained that she would not take her Ritalin for 7 to 10 days, then would resume taking the medication when she felt sleepy. She also complained of delusions and hallucinations. Dr. Cotton continued to prescribe Ritalin through 1985.

In October 1986, Dr. Cotton questioned his diagnosis, deciding that Sands was not narcoleptic, but, rather, had a stress disorder, and took her off the Ritalin. From 1986 to approximately 1991, Sands was not taking any Ritalin other than what she had left over from her last prescription from Dr. Cotton. In this period, she finished college and received her degree.

Sands began working as a full-time chemist at IBP's Dakota City, Nebraska, facility in May 1987. At the beginning of her full-time employment, Sands told her immediate supervisor, Paul Skelton, that she had narcolepsy. Skelton stated that as long as she could function and was comfortable, there would be no problem. Sands did function acceptably from 1986 to 1989 and was promoted to chemist I with supervisory duties in April 1989. As a chemist, Sands was required to run experiments,

including the mixing of caustics and acids. She was exposed to perchloric acids, oxidizers, and other "shock sensitive" chemicals which would explode if allowed to dry at a high temperature. There were various carcinogens, irritants, and other reactive, flammable chemicals which presented a danger if not properly handled. Throughout the day, members of the lab personnel would be running experiments simultaneously.

During the time from 1986 to 1991 when Sands was not on Ritalin, there were no reports of any accidents attributable to Sands. In late 1989 and early 1990, Sands' narcolepsy became more pronounced. Sands appeared to have a problem with attention. She began to carry notes with her to remember how to carry out and complete experiments. She also told coworkers not to be alarmed if she needed to suddenly sit on the floor and did, on one occasion, do so. Once again, however, she functioned acceptably even without taking Ritalin. There was testimony that at some periods of time Sands' supervisor assigned other supervisors to watch Sands to make sure she did not make any mistakes or hurt herself. There was testimony by coworkers that after 1991 they were concerned about working with her.

In September 1990, Suzanne Shell became senior chemist I. At that time, Sands told her that Sands had problems with hallucinations because she could not take her medication while breast-feeding. Sands also explained to Shell that her predecessor had other supervisors watch over her and make sure nothing bad happened. Shell checked with Sands' old supervisor, who confirmed this information. Shell then assigned supervisors to monitor Sands.

Sands had work performance evaluations during this period which were above average with regard to the category of "safety." IBP's performance rating scale lists a 4.5 as below average, 5 as average, a 5.5 as above average, and a 6 as outstanding. In 1988, Sands' rating was a 6.3 overall and a 6 for safety. In 1989, Sands rated a 5.9 overall and a 5.8 for safety. In 1990, she rated a 5.3 with a safety rating of 5.5. In 1991, she rated a 4.7 overall and a 5 for safety.

Sands began to experience problems with her 1991 pregnancy; she would not take her Ritalin during pregnancy and was placed on medical leave in April 1991. Due to her inability to

take Ritalin during pregnancy and her concern about job security, Sands had a Norplant contraceptive implant to preclude further pregnancies prior to her return to work from her last pregnancy and so advised IBP. After Sands returned from medical leave in November 1991, some coworkers, who had talked to Shell, indicated that they had some fears about working with Sands. Shell became concerned about Sands' ability to work safely and took her concerns to David Soyk, IBP's medical case manager, and to Bruce George, IBP's manager of laboratories. Soyk interviewed Sands on October 23, 1991, to determine if she was capable of continuing work and found out at that time from Sands that she had narcolepsy. Sands reported both hallucinations and sleep attacks to Soyk.

Soyk and the others were concerned and decided they needed more information to determine if Sands could work safely, even though she had been doing so for 5 years. With Sands' permission, Soyk contacted Dr. Cotton initially to determine whether she could continue to work. Dr. Cotton responded that Sands could not continue to work safely in the lab at that time. Dr. Cotton had not seen Sands for almost 5 years. IBP then placed Sands on a medical leave of absence.

On December 27, 1991, Sands went to see Dr. Rodney Dean, a psychiatrist, on a referral from Dr. John Roberts, Sands' family physician, who was treating her for depression. Dr. Dean diagnosed Sands with narcolepsy and prescribed Ritalin for the condition. In December 1991, Dr. Dean, who was treating Sands at this time, thought that she had a substantial handicap and was unable to perform any task relating to her primary employment. Dr. Dean changed his opinion and medically cleared her to go back to work on January 30, 1992. Dr. Dean pointed out that even when Sands was most symptomatic, she had no incidents of spills or putting herself or other people in danger. Dr. Dean has remained Sands' treating physician for narcolepsy and examines her on the average of two times per year. Dr. Roberts asked for a second opinion and referred Sands to Dr. James Duggan, who also diagnosed Sands with narcolepsy.

Dr. Dean then referred Sands to Dr. Leonel Herrera, a neurologist, whom Sands saw on April 6, 1992. Dr. Herrera had a difference of opinion with Dr. Dean in that Dr. Herrera said that

the symptoms were not typical of narcolepsy. Dr. Dean agrees that they are not typical but, in his opinion, it is still narcolepsy. Dr. Roberts also concurs in the diagnosis of narcolepsy.

Soyk also contacted Drs. Roberts, Herrera, and Dean. Soyk and IBP's medical consultant, a Dr. John Kuhnlein, toured the lab, spoke with Sands, and examined Sands' job duties. Dr. Kuhnlein then reviewed Sands' file, which Soyk said contained medical and physician records. Dr. Kuhnlein was also of the medical opinion that Sands had narcolepsy. Based on this evaluation, Dr. Kuhnlein concluded on December 3, 1992, that Sands could not safely return to work as a chemist.

In January 1992, however, Dr. Dean indicated that Sands had been asymptomatic and that he had cleared her to return to work. Soyk requested a guarantee from Dr. Dean that Sands would never experience symptoms in the future, and Dr. Dean said that he could never guarantee anything medically. Dr. Dean also talked to Soyk about the work environment; he knew that Sands was dealing with acid and was very positive and felt that Sands could return to work as a chemist.

IBP repeatedly contacted Sands about discussing alternate employment positions and extended her 1-year leave of absence to a 2-year medical leave. Sands chose not to accept or bid on any of the positions which were discussed. IBP carried Sands on its records as an employee until December 30, 1992, when it officially terminated her from its employment.

On December 28, 1992, Sands filed a charge of disability discrimination against IBP pursuant to Neb. Rev. Stat. § 48-1104(1) and (2) (Reissue 1988) of the Nebraska Fair Employment Practice Act. The NEOC held a hearing on April 12, 1994. On September 14, the hearing examiner issued a recommended order and decision, and issued a supplement thereto dated September 21. This order found that (1) IBP discriminated against Sands because of her disability, (2) Sands was entitled to backpay, (3) IBP should pay reasonable attorney fees, (4) IBP should reinstate Sands to her former position, and (5) IBP should make reasonable accommodations for Sands' disability. On September 23, the NEOC entered the hearing examiner's recommended order and decision and supplement thereto as the final order of the commission.

Pursuant to Neb. Rev. Stat. § 48-1120 (Reissue 1993), IBP appealed this final order to the Lancaster County District Court. On August 3, 1995, the district court entered an order sustaining the final order of the NEOC. From this decision, IBP appeals, and Sands cross-appeals regarding the court's determination of backpay and unemployment compensation benefits.

## STANDARD OF REVIEW

Section 48-1120 (Reissue 1984) formerly stated that a party aggrieved by the NEOC's decision and order and directly affected thereby could institute proceedings in the district court. We then stated the standard of review for appeals pursuant to this section as follows: On appeal of review by the district court of an order of the NEOC, the Supreme Court will not disturb the district court's findings if they are supported by substantial evidence. See *Zalkins Peerless Co. v. Nebraska Equal Opp. Comm.*, 217 Neb. 289, 348 N.W.2d 846 (1984).

Section 48-1120 was amended in 1988, however, to state that appeals from the commission shall be in accordance with the Administrative Procedure Act. Neb. Rev. Stat. § 84-918 (Reissue 1994) of the act provides that when the petition instituting proceedings for review was filed in the district court before July 1, 1989, the appeal shall be heard de novo on the record. Section 84-918 of the act further states that when the petition instituting proceedings for review is filed in the district court on or after July 1, 1989, the appeal shall be reviewed for errors appearing on the record.

Therefore, the standard of review to be applied in a case involving an appeal from the district court's review of an NEOC decision is a review for errors appearing on the record. On an appeal under the Administrative Procedure Act, an appellate court reviews the judgment of the district court for errors appearing on the record and will not substitute its factual findings for those of the district court where competent evidence supports those findings. *Inner Harbour Hospitals v. State*, 251 Neb. 793, 559 N.W.2d 487 (1997); *Rainbolt v. State*, 250 Neb. 567, 550 N.W.2d 341 (1996); *Knowlton v. Harvey*, 249 Neb. 693, 545 N.W.2d 434 (1996); *Metro Renovation v. State*, 249 Neb. 337, 543 N.W.2d 715 (1996).

## ASSIGNMENTS OF ERROR

IBP assigns as error the district court's (1) conclusion that Sands was disabled within the meaning of Neb. Rev. Stat. § 48-1102(8) (Cum. Supp. 1992); (2) application to the evidence of the direct evidence standard of *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989), rather than the standard found in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); (3) conclusion that Sands' employment was unlawfully terminated in violation of § 48-1104; and (4) failure to conclude that Sands had not met her burden of proof as a matter of law under the *McDonnell Douglas Corp.* standard.

In her cross-appeal, Sands assigns as error the district court's finding that unemployment compensation benefits should be deducted from any backpay award and that the backpay was not subject to prejudgment interest.

## ANALYSIS

Section 48-1104 of the Nebraska Fair Employment Practice Act provided in relevant part that it "shall be an unlawful employment practice for an employer . . . to discharge any individual . . . with respect to . . . employment, because of such individual's . . . disability . . . ."

We first turn to IBP's assignment of error regarding the correct evidentiary standard to be applied in employment discrimination cases. We have held that in a discrimination suit brought under the provisions of the Nebraska Fair Employment Practice Act, the evidence presented on the issue of discrimination against a disabled person shall be as follows: (1) The complainant has the burden of proving a prima facie case of discrimination; (2) if the complainant succeeds in proving that prima facie case, the burden shifts to the respondent to articulate some legitimate, nondiscriminatory reason for the employee's rejection or discharge from employment; and (3) should the respondent carry the burden, the complainant must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the respondent were not its true reasons, but were a pretext for discrimination. See, *McCamish v. Douglas Cty. Hosp.*, 237 Neb. 484, 466

N.W.2d 521 (1991); *Father Flanagan's Boys' Home v. Goerke*, 224 Neb. 731, 401 N.W.2d 461 (1987); *Zalkins Peerless Co. v. Nebraska Equal Opp. Comm.*, 217 Neb. 289, 348 N.W.2d 846 (1984). See, also, *McDonnell Douglas Corp., supra*. Thus, the *McDonnell Douglas Corp.* standard is the correct evidentiary standard which should have been applied by the district court. Accordingly, we begin our review of the district court's decision regarding Sands' employment termination by utilizing this standard. The first question to be addressed, therefore, is whether the district court could have found that Sands proved a prima facie case of discrimination against a person with a disability pursuant to the Nebraska Fair Employment Practice Act. See, *McCamish, supra*; *Goerke, supra*. Sands may prove her prima facie case by showing

> "(1) that [s]he is a member of a protected class within the meaning of the Nebraska Fair Employment Practice Act, §§ 48-1101 et seq.; (2) that [s]he is qualified for the position of employment sought; (3) that [s]he applied for and was rejected [or discharged from] that position; and (4) that after [s]he was rejected [or discharged] the job remained open."

*Goerke*, 224 Neb. at 737, 401 N.W.2d at 464. Accord *McCamish, supra*.

Section 48-1102(8) defined disability as "any physical or mental condition . . . as determined by a physician, but does not reasonably preclude a person's ability to engage in a particular occupation."

The record establishes that Sands has narcolepsy. Drs. Dean, Kuhnlein, Duggan, and Roberts all agree in this diagnosis. To be part of a protected class, however, Sands must also establish that her condition did not reasonably preclude her ability to engage in her occupation and did not adversely affect her carrying out her responsibilities as a chemist. Thus, the key inquiry is whether Sands' condition inhibits her ability to perform her job safely and efficiently. See *McCamish, supra*.

IBP argues that pursuant to the *Goerke* case, the question of whether the nature and extent of the individual's disability reasonably precludes adequate performance of the job turns on whether a risk is presented, not whether or not an episode has

actually occurred. IBP, however, has not presented evidence that a risk has been or will be presented. In the present case, unlike *Goerke*, Sands had performance evaluations in the area of safety which indicated an average or above rating. These evaluations directly contradict IBP's argument that it was concerned that a risk was presented. Sands' duties as a chemist involve handling caustics and acids, carcinogens, irritants, and other flammable chemicals. Sands handled these chemicals while other chemists were running other experiments. Sands' evidence is that her condition is under control and that even when she was symptomatic, no accidents occurred which were attributable to her. Further, her physician, Dr. Dean, testified that although he could not guarantee that she would not have further symptoms, she was capable of returning to work. Even Sands' performance evaluations indicated that her safety ratings ranged from average to outstanding. The district court could have found, based on this evidence, that Sands, although a narcoleptic, was able to perform the exact job from which she was discharged. Therefore, the district court could have found that Sands proved that she is a member of a protected class and, therefore, established a prima facie case of employment discrimination prohibited by the Nebraska Fair Employment Practice Act.

At first glance, this finding appears to be in conflict with *Father Flanagan's Boys' Home v. Goerke*, 224 Neb. 731, 401 N.W.2d 461 (1987), in which we held that the employee's epilepsy was not unrelated to his ability to perform a job requiring transportation of children in motor vehicles despite the fact that his condition was well controlled with medication and that he had never experienced a seizure while operating a vehicle. In *Goerke*, we reviewed the district court's finding in favor of the employer de novo on the record. As noted above, the standard of review has been changed by statutory amendment since *Goerke*, and in this case, we must affirm the district court's factual findings in favor of Sands if they are supported by any competent evidence. For the reasons stated, we have determined that there is competent evidence in the record to support the district court's finding of unlawful employment discrimination.

Having determined that the district court could have found that Sands made her prima facie case of discrimination, we turn

to part 2 of the standard in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), which requires that IBP has the burden of articulating some legitimate, nondiscriminatory reason for Sands' termination. IBP has not met its burden by advancing any such reason. IBP argues that Sands' employment was terminated for safety reasons. Again, the record indicates no evidence of such a safety concern. IBP's own rating standards found Sands performing at average or above average in the safety category throughout her employment with the company. Again, because IBP articulated no legitimate, nondiscriminatory reason for Sands' employment termination, we find that the district court could have found that IBP discriminated against her in violation of the Nebraska Fair Employment Practice Act.

After determining that the district court did not err in its finding that IBP discriminated against Sands, we now turn to the issue of damages. The district court declined to award prejudgment interest, and instead awarded Sands backpay and reasonable attorney fees. The district court adopted the NEOC hearing officer's recommendation that benefits received by Sands as unemployment compensation should be deducted from any backpay award.

On cross-appeal, Sands argues that unemployment compensation benefits should not be deducted from any backpay award and that the backpay should be subject to prejudgment interest. These arguments are without merit. We have held that unemployment compensation awards should be deducted from a backpay award under the Nebraska Fair Employment Practice Act. See *Airport Inn v. Nebraska Equal Opp. Comm.*, 217 Neb. 852, 353 N.W.2d 727 (1984). Prejudgment interest may be awarded only as provided under Neb. Rev. Stat. § 45-103.02 (Cum. Supp. 1996). Accordingly, Sands' unemployment compensation benefits should be deducted from any backpay award. Further, the backpay award is not subject to prejudgment interest.

## CONCLUSION

We conclude that the district court did not err in its decision that Sands' narcolepsy did not reasonably preclude her ability to

engage in her occupation as a chemist and, thus, her discharge was discriminatory. We further conclude that the district court was correct in its determination that unemployment compensation benefits should be deducted from Sands' backpay award and that such award is not subject to prejudgment interest. We, therefore, affirm the order of the district court which affirmed the findings of the NEOC.

AFFIRMED.