590 N.W.2d 688 (1999)
256 Neb. 394
FATHER FLANAGAN'S BOYS' HOME, appellee,
v.
Kenneth P. AGNEW, appellant.
No. S-97-1176.
Supreme Court of Nebraska.
March 12, 1999.
*689 John L. Apker and Christopher D. Curzon, of Dwyer, Smith, Grimm, Gardner, Pohren, Lazer & Rogers, Omaha, for appellant.
Sam Jensen, of Erickson & Sederstrom, P.C., Omaha, for appellee.
HENDRY, C.J., WRIGHT, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
*690 MILLER-LERMAN, J.

NATURE OF CASE
On October 14, 1997, the district court for Douglas County reversed the finding of the Nebraska Equal Opportunity Commission (NEOC) that Kenneth P. Agnew had been unlawfully discharged by Father Flanagan's Boys' Home (Boys Town) on the basis of his gender. Agnew appeals. We affirm the decision of the district court.

STATEMENT OF FACTS
Agnew began working for Boys Town in 1980, when he and his wife were hired as family teachers. Family teachers are married couples who live in homes on the Boys Town campus with children admitted to Boys Town. One family teacher couple is assigned to each residence, along with an assistant family teacher who supports the couple on a non-live-in basis. Residences are grouped in "communities," overseen by a community director. Each community director is assisted by two assistant directors, to whom specific homes within the community are assigned. The assistant directors' responsibilities include guiding the family teacher couples and the assistants through the daily operations of the homes and the raising and training of the children. Boys Town develops an individualized treatment plan for every child under its care, which plan addresses the training, social skills, and care needed by the child. Assistant directors are responsible for knowing and monitoring the plans for all children under their supervision. As part of their duties, assistant directors meet weekly with the family teacher couples they supervise to discuss issues concerning the homes, including each resident's treatment plan.
At the time of the administrative hearing in this case, Boys Town had seven residential communities. Initially, only boys were admitted to Boys Town. Later, girls were allowed to become residents. The children are divided into single-sex communities. At the time of the hearing, Boys Town Communities III, VI, and VII were all-girl communities.
In 1985, Agnew was promoted to senior assistant director of continuing care. In 1989, Agnew was promoted again, this time to the position of assistant director of Community VII, an all-girl community. Agnew continued to hold this position until his termination of employment. When Agnew first began working as the assistant director of Community VII, the community director was Mark Jones, a man. Later, Rita Borgstadt, a woman, became the director for Community VII. Agnew received satisfactory performance reviews while an assistant director. It was undisputed that but for the specific incident which preceded Agnew's termination from employment, he had not been at risk of being discharged.
In June 1994, a 17-year-old female, A.M., was a resident of Community VII, under the supervision of Gary Stessman and Brenda Stessman, her family teacher couple. At the time, A.M. was 8 ½ months pregnant. Part of A.M.'s treatment plan included medical care relative to her pregnancy and the anticipated birth of her child. During their weekly meetings, the Stessmans and Agnew would discuss A.M.'s medical condition and care.
In the later months of her pregnancy, A.M. had been experiencing "Braxton Hicks contractions." Part of Brenda Stessman's responsibilities included attending Lamaze classes with A.M. and teaching her to deal with the Braxton Hicks contractions. Due to her youth and inexperience, these contractions scared A.M., often causing her to panic and cry out in response to the contractions. The record shows that in May 1994, while watching Boys Town graduation ceremonies, A.M. tripped as she was walking up an aisle and began experiencing a series of contractions. According to Brenda Stessman,
She was going up the aisle to take some pictures, and she tripped and fell in the aisle. And the scare it must have been caused her to have one of those Braxton-Hicks contractions, and sheit scared her, and she panicked a little bit.
And so they called the rescue unit to come, and they just looked at her for a while, had her sit in the cruiser. They didn't take her to the hospital, but she sat in the ambulance for a little while, and they just monitored her vital signs, and she was fine.
*691 There was some evidence at the hearing that A.M.'s response to the Braxton Hicks contractions may have been, in part, an effort to gain attention.
During her residency at Boys Town, A.M. was assigned to assist Ann Wickenhauser, Boys Town's greenhouse manager. Wickenhauser oversaw Boys Town's greenhouses, gardens, fountains, and flowerbeds. She supervised Boys Town children as they performed various gardening duties. On June 2, 1994, a group of students under Wickenhauser's supervision, including A.M., was cleaning portions of Dowd Chapel on the Boys Town campus. According to Wickenhauser's testimony, while supervising the cleaning duties, she found A.M. lying on her side in the back of the chapel, crying and complaining that she had cramps. Wickenhauser tried to contact the Stessmans, and when she was unable to reach them, she paged Agnew, who was in a residence across the street from the chapel.
When Agnew called Wickenhauser, she explained the situation. According to Wickenhauser, Agnew responded that A.M. was using the incident to get attention and that Wickenhauser should just explain to A.M. that everything would be fine. Wickenhauser also stated that Agnew said A.M. "had gotten herself into a mess andand a fix and she was going to have to expect some kind of painsome kind of pain with it in response to the Braxton-Hicks, and he said, you know, that was part of it."
Wickenhauser testified she returned to A.M. and explained to her that she would be fine and that she was probably having Braxton Hicks contractions. Wickenhauser testified at the hearing that when A.M. continued to moan, she asked A.M. if she was going to be all right.
And I said, "Are you going to be okay?" And she said, "I don't think so."
And so I went back in, and we had a whole bunch of kids by that time that were around because the other church had finished their tasks. And so I went back, and I called, and I said, "We need to get her picked up." And [Agnew] said, "That's"  [sic] he was just across the street.
"Go ahead and have her walk across the street." And I saidI left, and I said okay and left and told one of my staff to go get the truck because we were going to go and just deliver her. [Agnew] had given me directions where it was, and it wasn't very far.
We were just going to deliver her to the house. Well, by the time I went to get her out of the pew, and by the time we got her out of the pew, she had collapsed. And so I sent all my kids away and ran back, called [Agnew] and said, "I'm calling the squad," kind of pretty much hung up on him and called the squad.
Upon hearing that the rescue squad had been called, Agnew walked across the street to the chapel. Agnew testified he talked to A.M., who advised Agnew that the pain was a little bit different than it had been previously. The rescue squad evaluated A.M. and decided to take her to the hospital.
Agnew overheard the rescue squad personnel comment that they were planning to take A.M. to Methodist Hospital. Agnew recalled a prior directive from Fr. Val Peter, the director of Boys Town, that Boys Town residents should not be taken to Methodist Hospital, but, rather, should go to St. Joseph Hospital. Agnew contacted Father Peter and informed him of the situation. Father Peter wanted to know what A.M.'s treatment plan was, namely, who was her treating physician and at what hospital she was scheduled for treatment. Agnew did not know and instructed the rescue squad to call the Boys Town clinic to get the information. The clinic reported A.M.'s treating physician was a Dr. Grush and that A.M. should go to St. Joseph Hospital. In a statement taken as part of the investigation following the incident, which statement was admitted into evidence, Agnew admitted that the information did not "sound right but [he] didn't know."
Agnew was soon paged by Borgstadt, the director for Community VII, who wanted to know what was happening. When Agnew gave Borgstadt the report, she advised Agnew that A.M.'s treating physician was in fact a Dr. Chupp and that, according to her treatment plan, A.M. was to be taken to Bergan Mercy Hospital, where the baby was *692 to be delivered. Borgstadt testified at the NEOC hearing that this information was all part of A.M.'s treatment plan and that Agnew should have known this information. A.M. was taken to Bergan Mercy Hospital for observation, and she was returned to Boys Town later that day.
Following the June 2, 1994, incident, Boys Town initiated a staff practice investigation into Agnew's handling of the episode. A staff practice investigation examines issues concerning the alleged violation of a child's rights at Boys Town, including the right to safety and care. During the investigation, statements and evidence are gathered, and after a report is prepared, a recommendation concerning staff discipline is made.
Agnew, Wickenhauser, A.M., and a nun in charge of Dowd Chapel were interviewed as part of the investigation. Thereafter, Dave Shanahan, the director of the Boys Town home campus operations, met with Borgstadt to discuss the investigation report. Both Shanahan and Borgstadt agreed that the situation involved a potentially serious health issue and that Agnew's response was inappropriate. Shanahan was concerned about the remark Agnew allegedly made concerning A.M.'s pregnancy, as well as Agnew's failure to respond quickly to the situation. Borgstadt was concerned that Agnew did not immediately personally go to A.M., but instead relied upon a Boys Town staff member who was not trained as to A.M.'s treatment plan. Furthermore, Borgstadt felt that Agnew should have been more fully aware of A.M.'s medical plan. Based upon the information gathered during the staff practice investigation, Borgstadt concluded and Shanahan agreed that Agnew's employment with Boys Town should be terminated. Agnew was informed of his employment termination on June 8, 1994. No other Boys Town employees were disciplined as a result of their involvement in the incident.
Agnew filed a complaint with the NEOC alleging that his termination of employment constituted illegal gender discrimination, in violation of Neb.Rev.Stat. § 48-1104(1) and (2) (Reissue 1998) of the Nebraska Fair Employment Practice Act (NFEPA). An NEOC hearing was held on November 7 through 8, 1995. Six witnesses testified in person, and 22 exhibits were received into evidence. A "Recommended Order and Decision" was issued on April 1, 1996, by the hearing officer, which recommended a finding in favor of Agnew. The NEOC's final order adopting the hearing officer's recommendations was entered on April 9.
Boys Town appealed the final order to the district court, under Neb.Rev.Stat. § 84-917 (Reissue 1994) of the Administrative Procedure Act. The district court reversed the NEOC's order on the basis that there was "insufficient evidence" for the hearing examiner to find other than for Boys Town. Agnew appeals from the district court's decision.

ASSIGNMENTS OF ERROR
Agnew assigns the following three errors: (1) The district court erred in not properly allocating the burden of the parties, (2) the district court erred in finding there was no substantial evidence to support the NEOC's finding of gender discrimination by Boys Town, and (3) the district court erred in not finding that Boys Town was liable for Agnew's attorney fees and "conducting affirmative acts."

STANDARD OF REVIEW
Boys Town appealed the NEOC decision pursuant to § 84-917 of the Administrative Procedure Act. Proceedings for review of an administrative agency's final decision are to the district court, which conducts the review without a jury de novo on the record of the agency. § 84-917(5)(a); Wolgamott v. Abramson, 253 Neb. 350, 570 N.W.2d 818 (1997).
A judgment or final order rendered by a district court in a judicial review pursuant to the Administrative Procedure Act may be reversed, vacated, or modified by an appellate court for errors appearing on the record. Neb.Rev.Stat. § 84-918(3) (Reissue 1994); Wolgamott, supra; Ventura v. State, 246 Neb. 116, 517 N.W.2d 368 (1994). "When reviewing an order of a district court under the Administrative Procedure Act for errors appearing on the record, the inquiry is *693 whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable." Wolgamott, 253 Neb. at 354, 570 N.W.2d at 822. An appellate court, in reviewing a district court judgment for errors appearing on the record, will not substitute its factual findings for those of the district court where competent evidence supports those findings. IBP, Inc. v. Sands, 252 Neb. 573, 563 N.W.2d 353 (1997); Ventura, supra. In a gender discrimination case, the judgment will be affirmed "unless the evidence was such that it compelled a finding" of sex discrimination. Snygg v. City of Scottsbluff Police Dept., 201 Neb. 16, 18, 266 N.W.2d 76, 78 (1978). When reviewing a question of law, however, an appellate court reaches a conclusion independent of the lower court's decision. Zimmerman v. FirsTier Bank, 255 Neb. 410, 585 N.W.2d 445 (1998); Pettit v. Paxton, 255 Neb. 279, 583 N.W.2d 604 (1998); Spencer v. Omaha Pub. Sch. Dist., 252 Neb. 750, 566 N.W.2d 757 (1997); Kindred v. City of Omaha Emp. Ret. Sys., 252 Neb. 658, 564 N.W.2d 592 (1997).

ANALYSIS
The core of Agnew's complaint is that his employment was terminated based on gender, in contravention of the NFEPA.
Section 48-1104 of the NFEPA provides:
It shall be an unlawful employment practice for an employer:
(1) To fail or refuse to hire, to discharge, or to harass any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, disability, marital status, or national origin; or
(2) To limit, advertise, solicit, segregate, or classify employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect such individual's status as an employee, because of such individual's race, color, religion, sex, disability, marital status, or national origin.
With respect to the jurisprudence under the NFEPA, we have previously stated: "Because the NFEPA is patterned from that part of the Civil Rights Act of 1964 contained in 42 U.S.C. §§ 2000e et seq. (1976), it is appropriate to look to federal court decisions construing similar and parent federal legislation." Airport Inn v. Nebraska Equal Opp. Comm., 217 Neb. 852, 856, 353 N.W.2d 727, 731 (1984). See, also, Bluff's Vision Clinic v. Krzyzanowski, 251 Neb. 116, 555 N.W.2d 556 (1996); Zalkins Peerless Co. v. Nebraska Equal Opp. Comm., 217 Neb. 289, 348 N.W.2d 846 (1984).
Agnew's allegations raise a claim of gender discrimination based upon disparate treatment, that is, that as a male he was treated differently than a similarly situated female was or would have been under the circumstances. The U.S. Supreme Court has outlined a three-part test, commonly referred to as the "McDonnell Douglas test," to be applied in disparate treatment cases. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). This court has adopted this test for purposes of construing the NFEPA. See, Harris v. Misty Lounge, Inc., 220 Neb. 678, 371 N.W.2d 688 (1985); Zalkins Peerless Co., supra.
Under a theory of disparate treatment, Agnew must initially establish a prima facie case of gender discrimination. At the hearing, Agnew demonstrated, without rebuttal from Boys Town, (1) that he was a male employee of Boys Town; (2) that he was discharged from employment by Boys Town; and (3) that after his discharge, a woman was hired to replace him. See Airport Inn, supra. Agnew, thus, established a prima facie case.
After Agnew successfully established his prima facie case, under the second part of the McDonnell Douglas test, the burden shifted to Boys Town to articulate a nondiscriminatory reason for Agnew's discharge. The U.S. Supreme Court, in St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506-07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), has analyzed and discussed the employer's burden, with the following explanation:

*694 [T]he McDonnell Douglas presumption places upon the defendant the burden of producing an explanation to rebut the prima facie casei.e., the burden of "producing evidence" that the adverse employment actions were taken "for a legitimate, nondiscriminatory reason." [Texas Dept. of Community Affairs v.] Burdine, 450 U.S. [248,] 254[, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) ]. "[T]he defendant must clearly set forth, through the introduction of admissible evidence," reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. Id., at 254-255, and n. 8 [101 S.Ct. 1089]. It is important to note, however, that although the McDonnell Douglas presumption shifts the burden of production to the defendant, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." 450 U.S., at 253, 101 S.Ct. 1089.
(Emphasis omitted.)
The U.S. Supreme Court further explained in St. Mary's Honor Center, 509 U.S. at 507-08, 113 S.Ct. 2742:
"If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." Burdine, 450 U.S., at 255 [101 S.Ct. 1089], and "drops from the case," id., at 255, n. 10 [101 S.Ct. 1089]. The plaintiff then has "the full and fair opportunity to demonstrate," through presentation of his own case and through cross-examination of the defendant's witnesses, "that the proffered reason was not the true reason for the employment decision," id., at 256 [101 S.Ct. 1089], and that [the protected characteristic] was. He retains that "ultimate burden of persuading the [trier of fact] that [he] has been the victim of intentional discrimination." Ibid.

In sum, once the employer produces evidence of legitimate, nondiscriminatory reasons for its actions, no presumption of discrimination exists.
A review of the record shows that Boys Town set forth nondiscriminatory explanations for its decision to terminate Agnew's employment, thus carrying its burden of production. These explanations included Agnew's failure to respond promptly or appropriately to the situation involving A.M. and his failure to be informed of her treatment plan. According to Boys Town's evidence, these nondiscriminatory reasons led Boys Town to conclude that Agnew's employment should be terminated. In our appellate review, we are not required to evaluate the wisdom of the decision to discharge Agnew, but, rather, whether there appear errors on the record in connection with the district court's implicit finding that Boys Town produced evidence of a legitimate, nondiscriminatory reason for terminating Agnew's employment, which reason rebutted Agnew's prima facie case of discrimination, and that Agnew did not thereafter prove intentional discrimination. We find no such errors.
With Boys Town's having met its burden of production, Agnew no longer enjoyed the presumption of discrimination, and it became incumbent upon Agnew to prove by a preponderance of the evidence that Boys Town intentionally discriminated against him because of his gender. See Zalkins Peerless Co. v. Nebraska Equal, Opp. Comm., 217 Neb. 289, 348 N.W.2d 846 (1984) (citing McDonnell Douglas three-part test). See, also, Harris v. Misty Lounge, Inc., 220 Neb. 678, 371 N.W.2d 688 (1985). The district court found that Agnew failed to produce such evidence, and upon our review for errors on the record, we agree.
As one of his assignments of error, Agnew claims that the district court erred in its application of the burden of proof. This assignment of error is without merit.
In support of his contention that the district court misapplied the burden of proof, Agnew argues that if a plaintiff presents direct evidence of discrimination, the burden of proof, and not merely the burden of production, shifts to the employer. Thus, according to Agnew and certain cases of which this court is aware, it has been determined that when a plaintiff produces "direct evidence that the protected characteristic was a motivating factor in the employment action," the McDonnell Douglas test no longer applies. *695 Smith v. F.W. Morse & Co., Inc., 76 F.3d 413, 421 (1st Cir.1996). See, also, Wall v. Trust Co. of Georgia, 946 F.2d 805 (11th Cir.1991); Lee v. Russell County Bd. of Educ., 684 F.2d 769 (11th Cir.1982). Because Agnew presented no direct evidence at the NEOC hearing that his termination of employment was based on his gender, we need neither address nor resolve whether under Nebraska jurisprudence the McDonnell Douglas test could become irrelevant in the face of direct evidence of discrimination based on a protected characteristic. On the record in this case, Agnew presented no direct evidence that his termination of employment was based upon his gender; therefore the analysis of his claim is confined to the traditional McDonnell Douglas test. See, Airport Inn v. Nebraska Equal. Opp. Comm., 217 Neb. 852, 353 N.W.2d 727 (1984); Zalkins Peerless Co., supra.
We have previously stated that direct evidence is that evidence which "`proves the fact in dispute directly.'" Bland v. Fox, 172 Neb. 662, 665, 111 N.W.2d 537, 540 (1961), quoting with approval 20 Am.Jur. Evidence § 4 (1939). When considering allegations of unlawful employment discrimination, it has been observed:
Direct evidence ... consists of statements by a person with control over the employment decision "sufficient to prove discrimination without inference or presumption."... The statements must reflect a "discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee."... Further, the statements "must be made by a person involved in the challenged decision." ... Evidence is not direct when the statement only "suggests discrimination" or "is subject to more than one interpretation." ... Thus, "stray remarks... statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself" are not direct evidence.
(Citations omitted.) Moore v. Alabama State University, 980 F.Supp. 426, 433-34 (M.D.Ala.1997) (holding that statements by employer that plaintiff would not be promoted because she was pregnant and because she was married mother constituted direct evidence of discrimination). See, also, Lee, 684 F.2d at 775 (holding that statements by school board members that classroom needed greater "`white presence'" and testimony by principal that race was factor of employment decision were direct evidence of discrimination).
In the instant case, Agnew presented evidence, not repeated in detail here, for the purported purpose of demonstrating discrimination in connection with his discharge. The showing, however, was not direct evidence of discrimination in terminating Agnew's employment. Thus, for example, Agnew asserted that Boys Town had a policy that only women could serve as assistant family teachers in all-girl communities. Boys Town acknowledged this hiring practice and noted that because the assistant family teacher would on occasion spend the night in the all-girl residence when the family teacher couple was absent, the assistant should be a female. We do not address the reasonableness of such a restriction, which issue is not before the court, but note that this restriction, without more, does not amount to direct evidence of prohibited gender discrimination. See Neb.Rev.Stat. § 48-1108 (Reissue 1998) ("[i]t shall not be an unlawful employment practice for an employer to hire and employ employees... on the basis of ... sex ... in those certain instances when ... sex ... is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise"). See, also, Torres v. Wisc. Dept. of Health & Social Services, 859 F.2d 1523, 1536 (7th Cir.1988) (holding that employing only female correctional officers in women's prison living units was appropriate "bona fide occupational qualification," given business of prison), cert. denied 489 U.S. 1017, 109 S.Ct. 1133, 103 L.Ed.2d 194 (1989). This evidence regarding hiring and other similar evidence were simply not direct evidence that Agnew was discharged based on gender. Agnew did not present direct evidence of discrimination in connection with his discharge and, therefore, cannot avoid the application of the McDonnell Douglas test, which the district court properly applied.

*696 CONCLUSION
We have reviewed this appeal for errors on the record. As required under the law, the district court conducted a de novo review of the record made before the NEOC. The district court found there was insufficient evidence in that record to sustain a finding of discrimination. There is competent evidence in the record to support this decision, and the decision conforms to the law and is neither arbitrary, capricious, nor unreasonable. We conclude that the district court did not err in reversing the NEOC's decision and dismissing the complaint. Because we affirm the district court's decision, we need not address Agnew's third assignment of error regarding attorney fees.
AFFIRMED.
CONNOLLY, J., not participating.