Lenard Arens, appellant, v.
NEBCO, Inc., appellee.
___ N.W.2d ___

Filed September 18, 2015.    No. S-14-290.

1. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by these rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

2. **Judges: Evidence: Appeal and Error.** The exercise of judicial discretion is implicit in determining the relevance of evidence, and an appellate court will not reverse a trial court's decision regarding relevance absent an abuse of discretion.

3. **Judgments: Words and Phrases.** A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

4. **Rules of Evidence: Hearsay: Appeal and Error.** Apart from rulings under the residual hearsay exception, an appellate court reviews for clear error the factual findings underpinning a trial court's hearsay ruling and reviews de novo the court's ultimate determination to admit evidence over a hearsay objection or exclude evidence on hearsay grounds.

5. **Directed Verdict: Appeal and Error.** In reviewing rulings on motions for directed verdict, an appellate court gives the nonmoving party the benefit of all evidence and reasonable inferences in his or her favor, and the question is whether a party is entitled to judgment as a matter of law.

6. **Evidence: Words and Phrases.** Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

7. **Evidence: Proof.** For evidence to be relevant, all that must be established is a rational, probative connection, however slight, between the offered evidence and a fact of consequence.

8. **Fair Employment Practices: Discrimination: Words and Phrases.** Under the Nebraska Fair Employment Practice Act, the threshold fact of consequence in a disability discrimination action is whether the plaintiff is a qualified individual with a disability—i.e., one who can perform the essential functions of the job with or without reasonable accommodations.

9. **Fair Employment Practices: Discrimination: Proof.** Under the Nebraska Fair Employment Practice Act, a covered employer's failure to make reasonable accommodations for a qualified individual's known physical or mental limitations is discrimination, unless the employer demonstrates that the accommodations would impose an undue hardship on business operations.

10. **Appeal and Error.** Unless an appellate court elects to notice plain error, it does not consider arguments and theories not presented to the lower court.

11. **Rules of Evidence: Hearsay: Records: Words and Phrases.** Under Neb. Evid. R. 803(5), Neb. Rev. Stat. § 27-803(5) (Reissue 2008), the business record exception to hearsay is not limited to records created by the holder of the records. It applies to a memorandum, report, record, or data compilation. The term "data compilation" is broad enough to include records furnished by third parties with knowledge of the relevant acts, events, or conditions if the third party has a duty to make the records and the holder of the record routinely compiles and keeps them.

12. **Rules of Evidence: Hearsay: Records.** Unlike Fed. R. Evid. 803(6), Neb. Evid. R. 803(5), Neb. Rev. Stat. § 27-803(5) (Reissue 2008), excludes opinions and diagnoses from the business record exception to hearsay.

13. **Trial: Evidence: Appeal and Error.** When part of an exhibit is inadmissible, a trial court has discretion to reject the exhibit entirely or to admit the admissible portion. Furthermore, because it is the proponent's responsibility to separate the admissible and inadmissible parts when offering evidence, an appellate court will ordinarily uphold a court's exclusion of an exhibit if the proponent did not properly limit its offer to the part or parts that are admissible.

14. ____: ____: ____. In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party.

15. **Evidence: Witnesses.** A party is generally permitted to present corroborating evidence on key issues, unless such evidence becomes excessive. But evidence from a neutral witness that corroborates a party's evidence on a central, contested issue is not cumulative—particularly if it is the party's best or most persuasive evidence.

16. **Fair Employment Practices: Discrimination: Proof.** Apart from an exception for summary judgments, in a discrimination action brought under the Nebraska Fair Employment Practice Act, a court evaluates the evidence under the three-part burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Under that framework, (1) the plaintiff has the burden of proving a prima facie case of discrimination; (2) if the plaintiff proves a prima facie case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action; and (3) if the employer articulates a nondiscriminatory reason for its action, the employee maintains the burden of proving that the stated reason was pretextual.

17. **Directed Verdict: Evidence: Appeal and Error.** A directed verdict is proper only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law. In reviewing that determination, an appellate court gives the nonmoving party the benefit of every controverted fact and all reasonable inferences from the evidence.

18. **Fair Employment Practices: Legislature: Intent: Discrimination: Courts.** The Legislature intended that its 1993 amendments to the Nebraska Fair Employment Practice Act would provide the same protections from employment discrimination that are provided under title I of the Americans with Disabilities Act of 1990. So it is appropriate for a court to consider how federal courts have interpreted the act's counterparts to those amendments.

19. **Fair Employment Practices: Discrimination: Proof.** To show a business necessity for requiring an employee (as distinguished from an applicant) to submit to a medical examination under Neb. Rev. Stat. § 48-1107.02(10) (Reissue 2010), an employer has the burden to show that (1) the business necessity is vital to the business; (2) it has a legitimate, nondiscriminatory reason to doubt the employee's ability to perform the essential functions of his or her duties; and (3) the examination is no broader than necessary. There must be significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his or her job. An employee's behavior cannot be merely annoying or inefficient to justify an examination; rather, there must be genuine reason to doubt whether that employee can perform job-related functions.

20. ____: ____: ____. Under Neb. Rev. Stat. § 48-1107.02(10) (Reissue 2010), the business necessity standard for required medical examinations is an objective test.

21. ____: ____: ____. Under Neb. Rev. Stat. § 48-1107.02(10) (Reissue 2010), whether an employer requires similarly situated employees to submit to a medical examination is relevant to whether the employer considers such examinations a business necessity. But any comparison between employees must be made with an eye to the ultimate inquiry, i.e., the necessity of the examination of the plaintiff. An employer's disparate treatment of employees regarding medical examinations cannot override substantial evidence that the employer had good reason to doubt the plaintiff's ability to perform the essential functions of the job.

22. **Employer and Employee: Discrimination.** An employer's doubts that an employee's ability to perform the essential functions of a job may be created by an employee's request for accommodations, frequent absences, or request for leave because of his or her medical condition. Such doubts can also be raised by the employer's knowledge of an employee's behavior that poses a direct threat to the employee or others.

23. **Employer and Employee: Discrimination: Proof.** Requiring an employee to submit to a medical examination is consistent with a business necessity only if the employer shows significant evidence that a reasonable person would doubt that the employee could perform the essential functions of the job, with or without reasonable accommodations, because of a medical condition.

Appeal from the District Court for Lancaster County: Jodi Nelson, Judge. Reversed and remanded for a new trial.

Joy Shiffermiller, of Shiffermiller Law Office, P.C., L.L.O., for appellant.

Shannon L. Doering and Luke F. Vavricek for appellee.

Heavican, C.J., Wright, Connolly, Stephan, Miller-Lerman, and Cassel, JJ.

Connolly, J.

## I. SUMMARY

The appellant, Lenard Arens, appeals from a jury verdict for NEBCO, Inc. (Nebco), in his disability discrimination action

under the Nebraska Fair Employment Practice Act (the Act).[1] He argues that the court's adverse evidentiary rulings prejudiced him and that the court erred in failing to direct a verdict for him. He moved for a general directed verdict and a directed verdict on his claim that Nebco required him to take medical examinations that were unlawful under the Act.

## II. PARTIES' GENERAL CONTENTIONS

In his complaint, Arens alleged that work-related accidents had limited his ability to climb and caused memory impairments that required him to have written instructions. He alleged that Nebco was aware of his disabilities and discriminated against him under the Act. And he alleged that Nebco terminated his employment for violating standards or conditions of employment that did not apply to employees without disabilities.

At trial, Arens primarily sought to prove that Nebco failed to accommodate his known mental and physical limitations, accommodations that it had previously considered reasonable. He argues the court deprived him of a fair trial by improperly excluding evidence that was crucial to this claim. Additionally, he sought to show that Nebco transferred him for driving incidents or conduct that it accepted from other drivers. He argues that this evidence showed Nebco's purported reasons for its adverse employment actions against him were pretextual as a matter of law. He moved for a directed verdict for that reason. He also moved for a directed verdict on his claim that Nebco discriminated against him by requiring him to complete medical examinations to perform work he was already doing. He argues that the court erred in overruling his motion because the examinations were per se unlawful discrimination under the Act.

---

[1] See Neb. Rev. Stat. §§ 48-1101 to 48-1126 (Reissue 2010 & Cum. Supp. 2014).

Nebco counters that it suspended Arens from driving a tractor-trailer and transferred him to driving a concrete truck because he was "irresponsible, insubordinate and reckless."[2] It further argues that driving a concrete truck required different physical abilities than those required for driving a tractor-trailer. So Nebco contends that it properly required Arens to take a "'fit for duty'" examination, as any other employee would have to do.[3] Finally, Nebco claims that it discharged Arens for failing to comply with employer-mandated counseling as a condition for laid-off employment status.

## III. BACKGROUND

### 1. Statutory Prohibitions

Under the Act, it is unlawful for a covered employer to take any of the following actions because of a person's disability: "To fail or refuse to hire, to discharge, or to harass any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment . . . ."[4] Apart from exceptions that do not apply, disability means "(a) a physical or mental impairment that substantially limits one or more of the major life activities of such individual, (b) a record of such an impairment, or (c) being regarded as having such an impairment."[5] The Act does not define major life activities. A person is a "[q]ualified individual with a disability" under the Act if he or she can perform the essential functions of the job with or without reasonable accommodations.[6]

Reasonable accommodations include employer actions such as job restructuring, reassignment to a vacant position, and appropriate adjustment or modification of examinations

---

[2] Brief for appellee at 12.

[3] *Id.*

[4] See § 48-1104(1).

[5] See § 48-1102(9).

[6] See § 48-1102(10)(a).

or policies.[7] It does not include accommodations that would impose an undue financial hardship on the employer.[8]

In addition to the Act's general prohibition against discriminatory employment practices, § 48-1107.02 sets forth a nonexclusive list of conduct that constitutes discrimination against a qualified individual with a disability. Under subsection (5), it is discrimination for a covered employer not to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability, unless the employer demonstrates that the accommodations would impose an undue hardship on business operations.[9] Under subsection (7), it is discrimination for a covered employer to use "qualification standards, employment tests, or other selection criteria that screen out or tend to screen out an individual with a disability . . . unless the standard, test, or other selection criteria . . . is shown to be job-related for the position in question and is consistent with business necessity."[10] And under subsection (10), it is discrimination to require an employee who is a qualified individual with a disability to take a medical examination unless the examination "is shown to be job-related and consistent with business necessity."[11]

## 2. Arens' Excluded Evidence

Before trial, the court heard Nebco's motion in limine to exclude exhibits 1 and 2, which comprised a letter and reports that were prepared in 1996 and 1998 by David Utley, a vocational rehabilitation counselor. Arens intended to offer this evidence to show Nebco's knowledge and previous accommodation of his mental impairments after a work-related

---

[7] See § 48-1102(11).

[8] See *id.*

[9] See § 48-1107.02(5).

[10] § 48-1107.02(7).

[11] § 48-1107.02(10).

accident. The court excluded the exhibits as hearsay. At trial, the court allowed Arens to make an offer of proof of Utley's testimony out of the jury's presence, after which Arens reoffered exhibits 1 and 2.

In the offer of proof, Utley testified that he had gathered facts and reviewed Arens' medical evaluations to determine his permanent work restrictions after a 1996 work-related accident. Arens sustained a traumatic brain injury in the accident. Utley said the reports from Arens' neuropsychological evaluations showed that (1) he had difficulty with attention, concentration, information recall, and emotional distress; and (2) he would likely need accommodations for his job, including written instructions. In 1998, Utley spoke to Nebco's agents about the accommodations that Arens would need for his permanent work restrictions. He said Nebco's agents knew Arens had memory problems and conflicts with coworkers but told him that they could accommodate his needs. Utley said that if Nebco had not been willing to accommodate Arens' mental impairments, his evaluation of Arens' loss of earning capacity could have been much higher.

Utley testified that his loss of earning report was a document that he regularly kept in the course of his consulting business. He admitted on cross-examination that (1) his consulting firm had destroyed his original reports before 2003 because the firm had closed Arens' case and (2) his testimony rested on his review of his reports. Nebco objected that (1) Utley could not provide a medical opinion; (2) his testimony was irrelevant, because it had nothing to do with Arens' discharge; (3) his testimony was cumulative because Arens had already testified that he received written instructions; and (4) Utley's testimony rested on documents that were hearsay.

In his offer of proof, Arens argued that the court should minimally allow Utley to state what his permanent work restrictions were in 1998 and that Nebco was willing to accommodate them. Additionally, Arens argued that Utley's report was relevant to prove that before Nebco discharged him, he had

shown the report to Lynn Blodgett, Nebco's human resources director. The court ruled that Utley's testimony was irrelevant to the proceedings. The court also excluded his reports in exhibits 1 and 2 as containing layers of hearsay.

### 3. Historical Facts

Nebco terminated Arens' employment in 2010. He had worked for Nebco since 1976. Beginning in 1978, he drove a concrete truck. But about 1986, he sustained a shattered kneecap in a work accident. Afterward, driving a concrete truck in the city was difficult because it required him to use his "clutch leg" often. He also said that concrete truckdrivers must climb a high ladder to wash out the mixing drum, often several times a day, which was difficult for him because there is little to hold onto. In 1990, his supervisor, Ron Hansen, assigned him to drive a tractor-trailer to deliver unmixed concrete materials to jobsites because it was easier on Arens' leg.

Later, Arens sustained a brain injury while making a delivery with a flatbed truck. Although he did not remember the accident, he knew he had fallen off the truck and been found unconscious. He was absent from work for 6 months and required rehabilitative care for speech and memory problems. He said he could not drive a concrete truck after this injury because he could not climb higher than his own height. He said that he was unstable above that height because after his injury, he experienced fear and dizzy spells when climbing ladders.

Arens' coworkers told him that he was not the same, but he thought he had not changed because "that's the way head injuries are." He continued to see a mental health professional after returning to work. He said Nebco employees would give him written instructions on order sheets because of his short-term memory problems.

Hansen was Arens' supervisor from 1978 until Hansen retired in the summer of 2006. Afterward, Gordon Wisbey was Arens' supervisor. Arens believed that Wisbey singled him out

for complaints about his work and ignored his disabilities. In October 2006, Wisbey documented an oral reprimand that he gave to Arens over a truck accident that damaged an electrical switchbox at a jobsite. Arens had hit the switchbox with his trailer while making a sharp turn into the driveway at the jobsite. Arens documented the accident in a damage report the day after it occurred. He reported that he had to watch a guard directing his tractor-trailer during the turn, which distracted him for a few seconds. Wisbey reprimanded him the next day. The reprimand stated that Nebco would not tolerate this behavior and that further instances of such behavior would result in more severe discipline, "up to and including termination." (Emphasis omitted.)

Arens testified that Hansen had never assigned him to drive Nebco's sole flatbed trailer with a forklift on the back because of Arens' climbing difficulties. (The driver must climb up onto the back of the trailer and then climb up into the forklift.) Instead, Hansen had assigned him to drive a flatbed trailer without a forklift. This testimony was uncontroverted.

But in 2008, Wisbey required Arens to drive the forklift truck. Arens said that he told Wisbey driving that truck was difficult for him because of his disabilities but that he feared losing his job if he did not comply. Wisbey denied that Arens had expressed an unwillingness to drive the forklift truck or told him that Hansen would not require him to drive it because of his disabilities. Wisbey conceded that driving the forklift truck was a more strenuous job and that two previous drivers with less seniority than Arens had also driven it. Wisbey had reassigned one of the junior drivers because he did not like driving the forklift truck and Wisbey wanted to accommodate his preference.

### (a) Truckyard Incident

On December 6, 2010, Arens avoided a vehicle accident when he turned his truck into the driveway of Nebco's

truckyard from a highway in Lincoln. He stated that as he was turning the corner into the driveway, cars rapidly approached the driveway from the opposite direction, which required him to turn the corner sharply to avoid an accident. This maneuver caused the back tires of the trailer to go over the grass close to a culvert. Arens said he was going only about 10 m.p.h. but was afraid to come to a complete stop on the highway because of heavy traffic. He said he maneuvered the turn the best he could, but a "tarp box" on the underside of the trailer hit the ground, scraping up some sod beside the driveway. Arens said he had someone from the garage check the tarp box and was told that it was not damaged.

When Arens clocked out on that Monday, a damage report was attached to his timecard. The damage report form required drivers to check whether they were reporting an auto accident or property damage. A separate acknowledgment signed by Arens in November 2010 stated that the employee understood the following required procedures:

• An incident report had to be completed within 24 hours after an incident even if no medical aid was provided to the employee, which form was to be provided by the driver's supervisor;

• an injury report had to be completed within 2 hours of an injury; and

• a "Truck Accident/Property Damage Report" had to be completed within 2 hours after an accident.

The acknowledgment did not define an "incident," and the record does not contain an "incident report" that is distinguishable from a "damage report."

Arens told a dispatcher that completing a damage report was unnecessary because there was no damage. He said that because tractor-trailer drivers frequently drive over grass, he did not think ripping up some sod required an incident report. Arens pointed to tracks in a photograph of the truckyard driveway that he believed showed other trucks had run over the grass in the same place that his truck did. Arens did fill

out a maintenance report to explain why the tarp box needed
to be checked for damage.

### (b) Roundabout Incident

On Tuesday, December 7, 2010, Wisbey asked Arens why he
did not file an incident report on December 6. Arens responded
that there was no damage and walked away. Arens said that
on the same day, Nebco employees overloaded his truck for
a delivery in Lincoln on Wednesday. Arens complained about
the weight of the materials and the way they were stacked
around the forklift, but he complied with Nebco's directive
to make the delivery on Wednesday. When he maneuvered a
roundabout, however, the truck was damaged when the front
frame of the trailer hooked the tractor. He said that it was dif-
ficult to make the maneuver because of the excessive weight
on the truck. Arens said that the same problem had occurred
numerous times, including one other time to himself, and that
it would have happened to any driver making this delivery. He
stated that Nebco did not direct him to take a route that would
have avoided the roundabout.

When Arens arrived at the delivery site on Wednesday,
December 8, 2010, the customer said he had not ordered that
much material, did not want it all unloaded, and had asked for
delivery on a different type of truck. Arens said that making
the delivery in the forklift truck was unnecessary. He did not
file a damage report but did complete a maintenance report. He
considered the incident an unavoidable problem that he had not
caused. Wisbey said that other drivers had safely maneuvered
roundabouts in trucks of similar lengths.

That Wednesday, Wisbey did not discuss the roundabout
incident with Arens or place a damage report on his timecard.
He said he had already talked to the general manager and
had developed a plan for dealing with Arens. On Thursday,
December 9, 2010, Wisbey completed a damage report for
the roundabout incident that stated Arens "somehow got truck
and trailer in a bind" and damaged the truck. He estimated

the damage to be $2,500. He also called Arens on Thursday while Arens was driving and said that if he had been at work on Monday, the day of the truckyard incident, he would have fired Arens. Arens said that he was dumbfounded and terrified by Wisbey's statement.

### (c) Nebco's Adverse
### Employment Actions

Early on Friday morning, December 10, 2010, Wisbey called Arens into his office. Arens said Wisbey told him that he could not work at Nebco. Arens said Wisbey's tone was angry and berating and left him in tears. Arens believed that Nebco had discharged him. Wisbey admitted that he told Arens he could not drive a tractor-trailer again. He said he told Arens that he was reassigning him to drive a concrete truck. Wisbey filled out a damage report that Friday about the truckyard incident on the previous Monday. The report stated that Arens had cut his turn short rather than stopping his truck, causing his inside trailer wheels to drop off the drive and into the ditch. It further stated that the maneuver had caused property damage to the yard and a toolbox under the trailer and that Arens was seen replacing the sod. Wisbey estimated the damage to be $250.

Because it was a slow time for delivering premixed concrete, Arens' transfer meant that he was laid off and would not receive any income unless the company called him back to duty the following year. Wisbey did not consider reassigning Arens to a mechanic position. He said Arens cried and repeatedly asked to just go back to driving his former truck, without a forklift. Wisbey said that he was frustrated during the 3-hour meeting because Arens had his head in his hands, would not look at Wisbey, and did not appear to understand Wisbey's statements. Wisbey denied knowing that Arens had sustained a head injury, that he had emotional problems, or that he could not drive a concrete truck. Wisbey admitted that he would have permitted Arens to continue driving the forklift

truck and would not have laid him off except for the driving incidents on December 6 and 8, 2010.

Wisbey also admitted that in 2009 and 2010, other drivers under his supervision possibly had as many as 20 total accidents. He admitted that when he drove a concrete truck, he also had accidents. He admitted that other truckdrivers besides Arens had not filed incident reports and that he had filled out reports for other drivers. He could not recall reassigning any of these drivers to different positions because they had an accident or failed to file an incident report.

Before Arens left Wisbey's office on Friday, December 10, 2010, Wisbey scheduled an appointment for him on the following Monday at an occupational health facility for a screening examination to determine if he could drive a concrete truck. Wisbey knew Arens had just completed a physical to maintain his commercial driver's license. He admitted that Arens did not have problems when he drove the flatbed truck without a forklift and that a screening physical would not have been required if Wisbey had allowed Arens to return to driving his former truck.

On Monday morning, December 13, 2010, Arens spoke to Blodgett, the human resources director. Blodgett said that Arens told her he was going to a screening physical and was not sure why. He wanted an appointment with her and Wisbey. Blodgett scheduled the appointment for that afternoon. Blodgett said Arens showed her a letter or accommodation report that stated Nebco should give Arens written instructions. When Arens' attorney asked her if Arens had shown her exhibit 1—Utley's 1998 report—Nebco objected that the court had excluded this evidence. The court allowed Arens to ask Blodgett whether Arens had shown her exhibit 1 but warned that he could not ask her about the document itself. Blodgett said she had not seen the document well enough to know whether Arens had shown it to her. After Arens impeached Blodgett with her meeting notes, she admitted that Nebco's nurse knew about Arens' need to have instructions written

down so that he could understand them because the nurse had worked with his doctor many years earlier.

Wisbey said that on Monday afternoon, Arens was distraught that Nebco was transferring him. During the meeting, Wisbey called Nebco's nurse and learned that Arens had failed the screening physical to drive a concrete truck. Nebco's examiner failed Arens because he could not climb an 18-inch step or perform repetitive squats. Arens said that he informed Wisbey and Blodgett that driving a concrete truck was a problem for him because he could not climb ladders anymore to wash out the drum. Arens asked several times if he could drive a dump truck or his former truck.

Blodgett admitted that Arens said he had injured his knee but had learned to compensate for the injury and drive his former truck. She originally documented that the physical showed Arens could drive his former truck. But on cross-examination by Nebco, Blodgett said that after further investigation, she later documented that the physical showed Arens should not perform either job—driving a concrete truck or his former truck. She said Wisbey told Arens that he could not put Arens back in his former truck because he could not meet the physical requirements.

Only after informing Arens that he failed the physical did Wisbey discuss Arens' driving accidents and failure to file a report. Wisbey admitted that the concrete truckdriver who replaced Arens did not have to take another physical before driving the tractor-trailer with a forklift because Nebco's drivers are cross-trained and moved around.

At the December 13, 2010, meeting, Arens became very upset that Wisbey would not let him drive his former truck without the forklift. Wisbey and Blodgett were concerned that he would hurt himself. Wisbey said he gave Arens a card and a pamphlet for counseling through the employee assistance program and told Arens that he needed to attend a meeting with those providers. Blodgett said that Wisbey told Arens that he must attend employer-mandated counseling as a

condition for laid-off employment status. Wisbey denied that Arens told him that he already had a psychologist whom he was seeing.

Arens said Wisbey "threw a card" at him but did not write out instructions to go to counseling, state the purpose of the counseling, or inform him that Nebco would discharge him if he failed to attend. Blodgett said she called the employee assistance program provider and reported that Nebco was referring Arens for employer-mandated services, that he was very upset, and that Nebco's agents did not know how to handle the situation. She said the counseling was for Arens' benefit to help him work through his problems. She did not state any problems that Nebco wanted Arens to correct, such as not following instructions. She spoke to Arens again on December 16, 2010, and reminded him that the counseling was mandated.

Arens said he believed that Nebco had discharged him on December 10 and 13, 2010. But he called back after December 13 and asked to be transferred to a mechanic position. Wisbey said he did not have authority to hire someone for employment in the garage. But Wisbey admitted that he had frequently transferred another concrete truckdriver to a mechanic position so that he would not be laid off during slow times. Blodgett said those positions are filled by employees who have been transferring in for several years.

Wisbey said he intended to offer Arens laid-off status at this meeting, not to terminate him. He said that he suspended Arens on December 10, 2010, but allowed him to take vacation days starting December 13. Nebco pointed to this evidence to show that it did not discharge Arens on December 10 or 13. But Wisbey admitted that he did not have a plan for Arens to show up for work and earn wages after December 13.

Arens said he called the provider's office on the card that Wisbey had given him and reported that he was already seeing a psychologist. He said the provider told him it was not mandatory that he also receive counseling from that office. On

December 21, 2010, Wisbey informed Arens by letter that his employment had been terminated because he failed to report to employer-mandated counseling "as you represented you would do at our meeting." The provider could not verify whether Nebco had referred Arens for counseling or whether Arens had called to ask whether he could continue to see his own psychologist. Wisbey admitted that when he wrote the termination letter on December 21, he knew that Arens had told Blodgett he was entitled to disability accommodations.

On cross-examination, Nebco showed Arens two medical releases from 2007 that were issued after he had a hip replacement surgery in December 2006. The March 2007 release recommended that he return to work but restricted him from climbing ladders or stairs. The June 2007 release imposed no restrictions. But on redirect examination, Arens stated that the physician who treated his hip had never treated him for his head injury.

### (d) Procedural History

At the close of the evidence, Arens moved for a general directed verdict. He also moved for a directed verdict because under the Act, Nebco's demand that Arens submit to medical examinations was illegal as a matter of law. He asked the court to instruct the jury to that effect and allow it to determine damages. The court overruled the motions. The jury returned a verdict for Nebco.

### IV. ASSIGNMENTS OF ERROR

Arens assigns, restated, that the court erred as follows:

(1) sustaining Nebco's motion in limine to exclude the testimony of Utley and exhibits 1 and 2;

(2) upholding the jury's verdict for Nebco because it was unsupported by the evidence and no reasonable jury could have concluded that Nebco's articulated reason for its disparate treatment of Arens was not a pretext for discrimination;

(3) overruling Arens' motion for a directed verdict because Nebco's physical examination of Arens was per se unlawful and its treatment of him was based on his disability; and

(4) overruling Arens' motion for a new trial because the verdict was not supported by the evidence, the court erroneously ruled on the admissibility of evidence and trial motions, and the court's evidentiary rulings prevented Arens from receiving a fair trial.

We note that Arens also argues that the court improperly instructed the jury on the *McDonnell Douglas Corp.*[12] framework for shifting burdens of production. But we do not address this argument because it is not assigned as error in his brief.[13]

## V. STANDARD OF REVIEW

[1-3] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by these rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[14] The exercise of judicial discretion is implicit in determining the relevance of evidence, and we will not reverse a trial court's decision regarding relevance absent an abuse of discretion.[15] A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[16]

[4] Apart from rulings under the residual hearsay exception, we review for clear error the factual findings underpinning a trial court's hearsay ruling and review de novo the court's

---

[12] See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

[13] See, e.g., *Melanie M. v. Winterer*, 290 Neb. 764, 862 N.W.2d 76 (2015).

[14] *Griffith v. Drew's LLC*, 290 Neb. 508, 860 N.W.2d 749 (2015).

[15] *Id.*

[16] *Credit Mgmt. Servs. v. Jefferson*, 290 Neb. 664, 861 N.W.2d 432 (2015).

ultimate determination to admit evidence over a hearsay objection or exclude evidence on hearsay grounds.[17]

[5] In reviewing rulings on motions for directed verdict, we give the nonmoving party the benefit of all evidence and reasonable inferences in his or her favor, and the question is whether a party is entitled to judgment as a matter of law.[18]

## VI. ANALYSIS

### 1. Court Erred in Excluding Utley's Testimony

As noted, the court excluded Utley's testimony as irrelevant and exhibits 1 and 2 as hearsay. From this evidence, Arens intended to show that he had permanent mental impairments following his 1996 brain injury, that Nebco had accommodated them in the past, and that Nebco could have accommodated him in 2010. Arens contends that the court erred in excluding this evidence, depriving him of a fair trial.

Regarding Utley's testimony, Nebco contends that because Utley had not seen Arens since 1998, his testimony was not relevant to any issue at trial. We disagree.

[6,7] Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.[19] For evidence to be relevant, all that must be established is a rational, probative connection, however slight, between the offered evidence and a fact of consequence.[20]

[8] Under the Act, the threshold fact of consequence in a disability discrimination action is whether the plaintiff is a qualified individual with a disability—i.e., one who can

---

[17] See *State v. McCave*, 282 Neb. 500, 805 N.W.2d 290 (2011).

[18] *First Express Servs. Group v. Easter*, 286 Neb. 912, 840 N.W.2d 465 (2013).

[19] *Griffith, supra* note 14.

[20] *Id.*

perform the essential functions of the job with or without reasonable accommodations. Utley's testimony was obviously relevant to establishing whether Arens had a disability and whether he had previously performed his job with reasonable accommodations.

[9] Furthermore, under the Act, a covered employer's failure to make reasonable accommodations for a qualified individual's *known* physical or mental limitations is discrimination, unless the employer demonstrates that accommodating the individual's limitations would impose an undue hardship on business operations.[21] So Utley's testimony was also relevant to establishing Nebco's knowledge of Arens' mental impairments, including his conflicts with coworkers after his 1996 accident. It was also relevant to whether Nebco had previously considered its accommodations of his mental impairments reasonable. Nebco does not argue that Arens' mental impairments did not affect a major life activity. And even if Utley had not seen Arens since 1998, his testimony would have established that Arens' impairments and work restrictions in 1998 were permanent. Although Utley relied upon medical opinions to describe Arens' impairments, as a vocational rehabilitation counselor, he could relate his own opinions based on other experts' conclusions.[22] Thus, the court should have admitted Utley's opinions bearing on these issues. We conclude that the court erred in excluding Utley's testimony as irrelevant.

## 2. Court Did Not Abuse Its Discretion in Excluding Exhibits 1 and 2

Regarding exhibits 1 and 2, Arens argues that Utley's documents were in Nebco's personnel file for Arens and constituted its business records. Nebco does not respond to this

---

[21] See § 48-1107.02(5).

[22] See, e.g., *Brennan v. Reinhart Institutional Foods*, 211 F.3d 449 (8th Cir. 2000); 2 McCormick on Evidence § 324.3 (Kenneth S. Broun et al. eds., 7th ed. 2013).

argument. Instead, it argues that the court properly excluded the exhibits because they contained multiple levels of hearsay. It argues that Arens could have presented only the testimony of the individuals whose opinions and reports Utley had reviewed to reach the conclusions in his reports. In Arens' reply brief, he responds that Nebco's argument is contrary to its own reliance on Arens' medical records in its personnel file. Specifically, he notes that Nebco presented evidence from its personnel file that a physician released Arens to return to work without restrictions following his hip replacement surgery in December 2006.

[10] We recognize that Nebco also relied on medical records of Arens' physical limitations in its files. But we do not consider here whether the documents in exhibits 1 and 2 were admissible under a different theory because Arens argued only that they were admissible as business records. Unless we elect to notice plain error, we do not consider arguments and theories not presented to the lower court.[23]

Under Neb. Evid. R. 803(5), Neb. Rev. Stat. § 27-803(5) (Reissue 2008), business records are an exception to the general exclusion of hearsay evidence:

A memorandum, report, record, *or data compilation*, in any form, of acts, events, or conditions, other than opinions or diagnoses, made at or near the time of such acts, events, or conditions, in the course of a regularly conducted activity, if it was the regular course of such activity to make such memorandum, report, record, or data compilation at the time of such act, event, or condition, or within a reasonable time thereafter, as shown by the testimony of the custodian or other qualified witness unless the source of information or method or circumstances of preparation indicate lack of trustworthiness.

---

[23] See, *Wayne G. v. Jacqueline W.*, 288 Neb. 262, 847 N.W.2d 85 (2014); *Bedore v. Ranch Oil Co.*, 282 Neb. 553, 805 N.W.2d 68 (2011).

(Emphasis supplied.) Parenthetically, we note that in 2014, after this trial, the Legislature amended § 27-803(5) to add an exception for acquired business records.[24] But that amendment is not relevant to our analysis.

[11] The important point here is that under § 27-803(5), the business record exception to hearsay is not limited to records created by the holder of the records. It applies to a memorandum, report, record, or *data compilation*. The term "data compilation" is broad enough to include records furnished by third parties with knowledge of the relevant acts, events, or conditions if the third party has a duty to make the records and the holder of the record routinely compiles and keeps them.[25]

Utley's documents in exhibits 1 and 2 were prepared by him as a regular part of his duties at the relevant times. Because Utley prepared them, he was a person qualified to authenticate them. Nebco did not deny that the records were from its own files or object that Arens' foundation evidence for the exception was insufficient. And there was evidence that Nebco had relied on the records.[26] We note that federal courts have held that medical records routinely made by a medical provider are admissible as business records when they are kept in an employee's file and the plaintiff shows that the physician who made the record did so in the relevant timeframe and as part of his or her regular practice.[27] We

---

[24] See, 2014 Neb. Laws, L.B. 788, § 7, codified at Neb. Rev. Stat. § 27-803(5)(b) (Cum. Supp. 2014); Floor Debate, 103d Leg., 2d Sess. 94-95 (Apr. 9, 2014) (explaining that amendment 2929 to L.B. 788 was originally presented as L.B. 151 and carried over); Judiciary Committee Hearing, L.B. 151, 103d Leg., 1st Sess. 1 (Jan. 25, 2013).

[25] See, e.g., *Gallegos v. Swift & Co.*, 237 F.R.D. 633 (D. Colo. 2006).

[26] Compare *State v. Robinson*, 272 Neb. 582, 724 N.W.2d 35 (2006), *abrogated in part on other grounds, State v. Thorpe*, 280 Neb. 11, 783 N.W.2d 749 (2010).

[27] See, *Hansen v. Fincantieri Marine Group, LLC*, 763 F.3d 832 (7th Cir. 2014); *Pace v. National R.R. Passenger Corp.*, 291 F. Supp. 2d 93 (D. Conn. 2003).

conclude that under these circumstances, the foundational requirements for admission were satisfied.

[12] But Nebraska's business record exception to hearsay is not a carbon copy of its federal counterpart.[28] Unlike Fed. R. Evid. 803(6), Nebraska's rule 803(5) excludes opinions and diagnoses from the business record exception. So Utley's opinions and Arens' medical diagnoses in these records were not admissible under this exception.

[13] It is true there were factual statements in Utley's reports which were admissible. Moreover, factual statements by Nebco's agents did not present a layered hearsay problem.[29] But when part of an exhibit is inadmissible, a trial court has discretion to reject the exhibit entirely or to admit the admissible portion. Furthermore, because it is the proponent's responsibility to separate the admissible and inadmissible parts when offering evidence, we will ordinarily uphold a court's exclusion of an exhibit if the proponent did not properly limit its offer to the part or parts that are admissible.[30]

Because Arens did not limit his offer of proof to admissible factual statements in Utley's reports, we conclude that the court did not abuse its discretion in excluding the exhibits.

## 3. Court's Exclusion of Utley's Testimony Was Reversible Error

[14] In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a

---

[28] See R. Collin Mangrum, Mangrum on Nebraska Evidence 865, 870 (2015).

[29] See Neb. Evid. R. 801(4)(b)(iv), Neb. Rev. Stat. § 27-801(4)(b)(iv) (Reissue 2008).

[30] See, *State v. Huston*, 285 Neb. 11, 824 N.W.2d 724 (2013); *Holman v. Papio-Missouri River Nat. Resources Dist.*, 246 Neb. 787, 523 N.W.2d 510 (1994); 1 McCormick on Evidence § 51 (Kenneth S. Broun et al. eds., 7th ed. 2013); 88 C.J.S. *Trial* § 182 (2012).

substantial right of the complaining party.[31] Nebco argues that even if the court incorrectly excluded Utley's testimony, the errors did not prejudice Arens because he testified that his brain injury affected his daily interactions with his coworkers and that Nebco had agreed to accommodate this issue. Nebco contends that a court's improper exclusion of evidence is not ordinarily prejudicial when the court admitted substantially similar evidence without objection. Arens responds that Utley's testimony was different from his own testimony about his injuries. We agree.

First, we note that Nebco incorrectly argues that "Arens testified that he had 'a permanent traumatic brain injury which affected his daily interactions with his coworkers' and that 'Nebco agreed to accommodate [that] issue.'"[32] Nebco pulls this quote from Arens' brief on appeal. But in this quote, Arens was arguing what his excluded evidence would have proved. And Nebco's citations to the record do not support its argument that Arens testified to the same facts that Utley's testimony would have shown.

It is true that Arens testified that after his brain injury, his coworkers told him that his personality had changed and that there was something wrong with him. But Arens could not express what had changed because he believed that he was the same as he had always been. He did not testify about his emotional distress, and he lacked objective awareness regarding his conflicts with coworkers. Although he acknowledged his relationship with Wisbey had deteriorated over the years, he said Wisbey had never discussed his conduct with him. Arens attributed their deteriorating relationship solely to Wisbey's discrimination. In contrast, Utley would have testified that one of Arens' permanent impairments was emotional distress. He would have stated that Nebco's agents

---

[31] *Steinhausen v. HomeServices of Neb.*, 289 Neb. 927, 857 N.W.2d 816 (2015).

[32] Brief for appellee at 14.

knew, after Arens' brain injury, he had expressed discontent with coworkers and had conflicts with them but that Nebco's agents had stated that they could make accommodations, through instruction and providing some latitude in his interactions with coworkers.

Arens also testified that after his brain injury, Nebco employees would write down instructions for him on order sheets because of his short-term memory problems. He said that without the instructions, he might go to the wrong delivery site or load the wrong materials. But his testimony failed to convey the extent of his known cognitive problems, which Nebco's agents had said they could accommodate. And the record shows that Arens was not the most persuasive witness on the issue of his impairments because he lacked command of the historical facts. For instance, he could not provide the date of his brain injury. So his testimony failed to establish the length of time that Nebco had accommodated his memory impairments.

[15] Whether Nebco knew the extent of Arens' mental impairments and whether it had previously considered accommodations of his impairments reasonable were central, contested issues in this trial. A party is generally permitted to present corroborating evidence on key issues, unless such evidence becomes excessive.[33] But evidence from a neutral witness that corroborates a party's evidence on a central, contested issue is not cumulative—particularly if it is the party's best or most persuasive evidence.[34]

Utley was a neutral witness, and his testimony was Arens' best evidence of Nebco's knowledge and previous accommodations. In contrast to Arens' testimony, Utley would

---

[33] See, also, 2 Clifford S. Fishman, Jones on Evidence Civil and Criminal § 11:17 (7th ed. 1994 & Cum. Supp. 2001).

[34] See *Ipock v. Union Ins. Co.*, 242 Neb. 448, 495 N.W.2d 905 (1993). Accord, *Zaken v. Boerer*, 964 F.2d 1319 (2d Cir. 1992); *Wasserman v. Bartholomew*, 923 P.2d 806 (Alaska 1996).

have testified that Nebco was willing to accommodate Arens' impairments after his brain injury. And those impairments included Arens' difficulty with attention, concentration, information recall, and emotional distress. These impairments were obviously relevant to whether Arens (1) accurately recalled the reporting requirement at issue, which Nebco did not explicitly explain on the damage report, and (2) understood oral instructions to attend employer-mandated counseling as a condition for his continued employment, despite a mental health care provider telling him that its counseling was not mandatory if he was seeing his own psychologist. Additionally, Utley would have testified that Nebco was willing to make reasonable accommodations for Arens' conflicts with coworkers. So a jury could have determined that Arens' inappropriate interactions with Wisbey were part of his known mental impairments instead of deliberate insubordination.

In sum, Utley's excluded testimony was probative of whether Nebco took adverse employment actions against Arens because of his known mental impairments without making accommodations that it had previously considered reasonable. Only Utley's testimony in the offer of proof showed Nebco had knowledge of Arens' impairments and its agents had said they could accommodate them. We conclude that the court's exclusion of his testimony was reversible error.

### 4. THE COURT DID NOT ERR IN OVERRULING ARENS' MOTION FOR A GENERAL DIRECTED VERDICT

Arens contends that no reasonable jury could have concluded that Nebco's articulated reason for its disparate treatment of him was not a pretext for discrimination. He argues that Nebco took adverse employment actions against him for driving incidents that were not out of the ordinary. He points to Wisbey's admissions that other drivers besides Arens had accidents and that he had filed incident reports for other drivers, without reassigning or discharging these drivers, and

without requiring them to comply with employer-mandated counseling. He further claims that the pretext was shown by Nebco's allegedly per se unlawful requirement that he pass a physical examination for the new position. Finally, Arens contends that the emotional lability he displayed in meetings with Wisbey was precisely the permanent impairment that was caused by his brain injury, not insubordination.

[16] Apart from an exception for summary judgments,[35] in a discrimination action brought under the Act, a court evaluates the evidence under the three-part burden-shifting framework from *McDonnell Douglas Corp.*[36] Under that framework, (1) the plaintiff has the burden of proving a prima facie case of discrimination; (2) if the plaintiff proves a prima facie case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action; and (3) if the employer articulates a nondiscriminatory reason for its action, the employee maintains the burden of proving that the stated reason was pretextual.[37] Only the final requirement is at issue here.

[17] A directed verdict is proper only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law.[38] In reviewing that determination, we give the nonmoving party the benefit of every controverted fact and all reasonable inferences from the evidence.[39]

There were primarily two separate adverse employment actions at issue in this trial: (1) Nebco's December 13, 2010,

[35] See *Marshall v. EyeCare Specialties*, 291 Neb. 264, 865 N.W.2d 343 (2015).

[36] See, *McDonnell Douglas Corp., supra* note 12; *IBP, inc. v. Sands*, 252 Neb. 573, 563 N.W.2d 353 (1997).

[37] See, *Trosper v. Bag 'N Save*, 273 Neb. 855, 734 N.W.2d 704 (2007); *Sands, supra* note 36.

[38] *Balames v. Ginn*, 290 Neb. 682, 861 N.W.2d 684 (2015).

[39] *Id.*

transfer of Arens to a position that placed him in indefinite laid-off status after he failed a fit-for-duty examination and (2) Nebco's December 21 discharge of Arens for failing to comply with psychological counseling. Arens argues that Nebco's stated reasons for both actions were pretextual.

It is true that there was evidence to support Arens' claim that the transfer was pretextual. Nebco argues that it transferred Arens because he was "irresponsible, insubordinate and reckless."[40] Yet, Nebco had previously reassigned Arens from driving a concrete truck because it was too difficult for him after his knee injury. Nebco is charged with knowledge of that action,[41] and Blodgett admitted Arens reported at the December 13, 2010, meeting that he had injured his knee but learned to compensate for it enough to drive his former truck. Wisbey admitted that Arens could drive the flatbed truck without a forklift and that a screening physical would not have been required if Wisbey had allowed Arens to return to driving that truck. So Nebco's transfer of Arens to a more strenuous position is inconsistent with its reason for transferring him.

But Blodgett also said that at the December 13, 2010, meeting, Wisbey discussed Arens' driving accidents, which is relevant to Nebco's claim that it transferred Arens for reckless driving. It is true that Wisbey admitted that other drivers had been in accidents or caused property damage and failed to complete damage reports without incurring adverse employment actions. But the court excluded evidence that would have shown the nature of those accidents and the number of times that Wisbey filled out reports for other drivers. And Arens has not assigned these rulings as error on appeal.

---

[40] Brief for appellee at 12.

[41] See 3 William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 789 (rev. vol. 2010).

We agree with Arens that Nebco could not transfer him for his known physical and mental impairments without first making reasonable accommodations or showing that it could not make accommodations. Obviously, the excluded evidence would be relevant to that determination on remand. But there was also evidence from which the jury could have concluded that Arens presented a safety risk that Nebco could not ignore. And the record fails to show as a matter of law that Nebco transferred Arens from driving a tractor-trailer for conduct which was no different from that of other drivers or that he did not present a greater safety risk.

Regarding the discharge, there was also evidence from which a jury could have found that Nebco's stated reason for the action—Arens' failure to comply with employer-mandated counseling—was pretextual. Wisbey informed Arens at the December 13, 2010, meeting that the fit-for-duty examination had disqualified him from driving a concrete truck and a tractor-trailer. Before Nebco discharged Arens on December 21, Wisbey had refused Arens' request to transfer to a mechanic position. Although Arens said he also asked to drive a dump truck on December 13, Wisbey testified that Nebco did not have plans for Arens to return to work and earn wages after that date.

But we cannot say as a matter of law that Nebco would not have rehired Arens for any driving position if he had complied with counseling. And there was some evidence from which a jury could have concluded that Arens refused to attend counseling despite Nebco's efforts to inform him that he must do so as a condition to continue in laid-off employment status.

In short, there was sufficient evidence to support reasonable, contrary inferences on the issue of pretext. We conclude that on this record, the court did not err in overruling Arens' motion for a general directed verdict.

5. The Court Applied the Wrong Legal Standard
in Overruling Arens' Motion for a
Directed Verdict for Unlawful
Medical Examinations

The Act defines disability discrimination to include an employer's requirement of medical examinations in two different circumstances. Section 48-1107.02(9)(c) applies to required medical examinations of job *applicants* to whom the employer has extended an offer of employment—i.e., employment entrance examinations. In that circumstance, the employer can require a medical examination to determine the applicant's ability to perform job-related functions if it (1) subjects all entering employees to the same examination; (2) keeps the examination information in a separate medical file and confidential, unless disclosure is authorized by the statute; and (3) does not use the examination results in a manner that is inconsistent with the Act.

But § 48-1107.02(10) is the subsection that applies to employees. As stated, under § 48-1107.02(10), disability discrimination includes "[r]equiring a medical examination or making inquiries of an employee as to whether the employee is an individual with a disability or as to the nature or severity of the disability, unless the examination or inquiry is shown to be job-related and consistent with business necessity."

Arens contends that Nebco's requirement that he complete a medical examination to drive a concrete truck violated § 48-1107.02(10). He argues that because he had difficulty climbing, the medical examination was required only to preclude him from returning to work. And he contends the examination was unlawful because there was no medical incident that warranted the screening. He similarly argues that Nebco's requirement that he attend counseling was unlawful. He contends that under federal case law, employers may not use a medical examination to disqualify an employee with a disability from work the employee can perform with or without accommodations, because of fear or speculation that the

disability indicates a risk of future injury, absenteeism, or insurance costs.

Nebco argues that once it decided to transfer Arens to driving a concrete truck, it had a right to ensure that he could safely operate the truck. It argues that the fitness-for-duty examination was therefore job related and a business necessity.

[18] The Legislature enacted § 48-1107.02 as part of the 1993 amendments to the Act.[42] Nebraska's two provisions governing discriminatory medical examinations mirror two provisions of the federal Americans with Disabilities Act of 1990 (ADA).[43] The close similarity of § 48-1107.02's medical examination provisions and the ADA provisions is not a coincidence. The Legislature specifically intended that its 1993 amendments to the Act would provide the same protections from employment discrimination that are provided under title I of the ADA.[44] So it is appropriate to consider how federal courts have interpreted the ADA counterparts to the 1993 amendments.

The ADA counterpart to § 48-1107.02(10) is 42 U.S.C. § 12112(d)(4)(A). It reflects the policy judgment that once an employee is doing a job, actual performance is the best measure of his or her ability and that medical examinations should be rarely required of employees.[45] Thus, under both federal regulations and federal case law, the requirement that an employer show that a medical examination requirement for employees was "consistent with business necessity" is a

---

[42] See 1993 Neb. Laws, L.B. 360, § 6.

[43] See 42 U.S.C. § 12112(d)(3) and (4) (2012).

[44] See Introducer's Statement of Intent, L.B. 360, Business and Labor Committee, 93d Leg., 1st Sess. (Jan. 29, 1993).

[45] 1 Jonathan R. Mook, Americans with Disabilities Act: Employee Rights & Employer Obligations § 5.04[3][a] (2014). See, also, Annot., 159 A.L.R. Fed. 89 (2000).

high standard.[46] Under 42 U.S.C. § 12112(d)(4)(A), courts generally consider psychological counseling to be a medical examination.[47]

We agree with the standards set out by federal courts to show a business necessity for requiring an employee to submit to a medical examination. Because the Legislature intended for the 1993 amendments to provide the same protections as title I of the ADA, we adopt them to evaluate the legality of a required medical examination under § 48-1107.02(10).

[19,20] Accordingly, to show a business necessity for requiring an employee (as distinguished from an applicant) to submit to a medical examination under § 48-1107.02(10), an employer has the burden to show that (1) the business necessity is vital to the business; (2) it has a legitimate, nondiscriminatory reason to doubt the employee's ability to perform the essential functions of his or her duties; and (3) the examination is no broader than necessary.[48]

> [F]or an employer's request for an exam to be upheld, there must be significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job. An employee's behavior cannot be merely annoying or inefficient to justify an examination; rather, there must be genuine reason to doubt whether that employee can "perform job-related functions."[49]

---

[46] See, 1 Mook, *supra* note 45, § 5.04[3][b]; Annot., 159 A.L.R. Fed., *supra* note 45.

[47] See, *Kroll v. White Lake Ambulance Authority*, 691 F.3d 809 (6th Cir. 2012); *Karraker v. Rent-A-Center, Inc.*, 411 F.3d 831 (7th Cir. 2005).

[48] See, *Kroll v. White Lake Ambulance Authority*, 763 F.3d 619 (6th Cir. 2014); *Wisbey v. City of Lincoln, Neb.*, 612 F.3d 667 (8th Cir. 2010), *abrogated on other grounds, Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011); *Conroy v. New York Dept. of Correctional*, 333 F.3d 88 (2d Cir. 2003).

[49] *Sullivan v. River Valley School Dist.*, 197 F.3d 804, 811 (6th Cir. 1999). Accord *Brownfield v. City of Yakima*, 612 F.3d 1140 (9th Cir. 2010).

The business necessity standard for required medical examinations is an objective test.[50]

[21] For disputed discrimination claims under § 48-1107.02(10), we further adopt the federal holding that whether an employer requires similarly situated employees to submit to a medical examination is relevant to whether the employer considers such examinations a business necessity.[51] But "any comparison between employees must be made with an eye to the ultimate inquiry, i.e., the necessity of the examination of the *plaintiff*."[52] An employer's disparate treatment of employees regarding medical examinations cannot override substantial evidence that the employer had good reason to doubt the plaintiff's ability to perform the essential functions of the job.[53]

[22] An employer's doubts about an employee's ability to perform the essential functions of a job may be created by an employee's request for accommodations, frequent absences, or request for leave because of his or her medical condition.[54] Such doubts can also be raised by the employer's knowledge of an employee's behavior that poses a direct threat to the employee or others.[55]

[23] Here, there is no question that Arens' physical ability to drive a truck was vital to Nebco's business. But even so, requiring an employee to submit to a medical examination is consistent with a business necessity only if the employer shows significant evidence that a reasonable person would doubt that the employee could perform the essential

---

[50] See, e.g., *Brownfield, supra* note 49; *Tice v. Centre Area Transp. Authority*, 247 F.3d 506 (3d Cir. 2001).

[51] See *Tice, supra* note 50.

[52] *Id.* at 519 (emphasis in original).

[53] See *id.*

[54] See, *Kroll, supra* note 48; *Wisbey, supra* note 48; *Gajda v. Manhatt., Bronx Surf. Trans. Oper. Auth.*, 396 F.3d 187 (2d Cir. 2005).

[55] See, *Kroll, supra* note 48; *Brownfield, supra* note 49.

functions of the job, with or without reasonable accommodations, because of a medical condition.

But this is not the business necessity standard that the court applied when Arens sought a directed verdict on the issue of unlawful medical examinations. In response to this motion, Nebco argued only that the fit-for-duty examination and psychological counseling were tailored to the job's duties. In overruling the motion for a directed verdict, the court relied on Nebco's argument. On appeal, Nebco argues that Arens was required to undergo a fit-for-duty examination to operate a concrete truck like every other employee who does that job. It contends that the examination was necessary because the job had different physical requirements. But it inconsistently argues that Wisbey did not anticipate any problems with transferring Arens because climbing the ladder on a concrete truck was very similar to the climbing that Arens had to do to get into the forklift on the back of his tractor-trailer.

We agree with Arens that Nebco's argument to the court confused the standard of medical examinations for applicants with the standard for employees. It is irrelevant that all newly entering employees must take a medical examination to drive and operate a concrete truck. Wisbey admitted that because Nebco's drivers are cross-trained, the employee who replaced Arens in driving a tractor-trailer was not required to take a medical examination. So the primary question regarding the fit-for-duty examination is whether Nebco presented substantial evidence that it had a nondiscriminatory reason to doubt Arens' physical ability to perform the essential functions of driving a concrete truck or tractor-trailer, with or without reasonable accommodations. Regarding the psychological counseling, the question is whether Nebco presented substantial evidence that it had a nondiscriminatory reason to doubt Arens' mental ability to perform the essential functions of these jobs, with or without reasonable accommodations.

Arens argues that under the ADA standard for requiring a medical examination, he was entitled to a directed verdict.

We decline to decide that factual question for the first time on appeal.[56] Instead, because the court's exclusion of Utley's testimony was prejudicial error, we reverse the court's judgment and remand the cause for a new trial. If the issue arises again, we direct the court to decide the issue under the legal standard that we have adopted here.

## VII. CONCLUSION

We conclude that the court erred in excluding Utley's testimony as irrelevant. Utley's testimony was relevant to show Nebco's knowledge of Utley's permanent mental impairments and whether it had previously accommodated them. The exclusion of this evidence was reversible error.

We conclude that the factual statements in Utley's reports were admissible as Nebco's business records. But because Arens did not offer only the admissible parts of these exhibits, the court did not abuse its discretion in excluding them.

We conclude that the court did not err in overruling Arens' motions for directed verdicts. But on remand, if the issue arises again, the court must apply the business necessity standard for medical examinations that we have set out above.

Reversed and remanded for a new trial.

McCormack, J., participating on briefs.

Stephan, J., not participating in the decision.

---

[56] See *Jacobitz v. Aurora Co-op*, 291 Neb. 349, 865 N.W.2d 353 (2015).